Memorandum of Decision
On September 11, 1997, the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Kimberly G. and Samuel R. to their daughters Katelynn G. and Samantha R. A trial on these petitions took place on September 24, 1998, at which time the mother, Kimberly G., executed Consents to terminate parental rights as to both children. The Court having found these Consents to have been entered knowingly and voluntarily, and with the assistance of competent legal counsel who was present with the mother, accepted these Consents at the commencement of the trial. The Court then proceeded to a trial on the issues as to the father, Samuel R. For the reasons stated below, the Court grants both petitions to terminate parental rights. CT Page 11522
FACTS
The Court finds the following facts and credits the following evidence.
A. Katelynn
Katelynn was born on September 19, 1994 and was four years at the time of trial. At the time of her birth, Yale New Haven Hospital made a referral to DCF regarding Katelynn on the basis of the mother's disclosure to a hospital social worker that she had used heroin the day before the delivery. The mother further disclosed a two year history of cocaine, heroin, and methadone use, including use throughout her pregnancy.
Katelynn has been living with a paternal cousin, Myrna R., since April 28, 1995. Originally, her parents failed to provide a residence for her. Just prior to Katelynn's first birthday, the mother was incarcerated, at which time DCF obtained an Order of Temporary Custody of Katelynn. Seven months later, on April 19, 1996, when Katelynn was nineteen months old, the Court entered judgment adjudicating her to have been neglected and committed her to DCF. The Court has granted extensions of the commitment through April 19, 1999. On March 14, 1997, the Court found that continued efforts to reunify the child with the parents were no longer appropriate.
Katelynn spends a significant amount of time with another paternal cousin, Azenth A., as Myrna R. works full-time. Katelynn considers both Myrna and Azenth as mothers. Katelynn is on target developmentally, speaks English and Spanish, and is in a pre-school program.
DCF originally offered the parents daily visitation with Katelynn because the relative foster care provider was willing to supervise the visits. The parent's visits were sporadic, short, and inconsistent. Katelynn's last contact with her biological mother was in March, 1997, at which time Azenth A. summoned the police because the mother was causing a disturbance during the visit and went into the bathroom to get "high" on drugs. The father's visits to Katelynn's relative foster care home ended with his incarceration in July, 1996 Occasionally, Myrna R. has taken Katelynn with her to visit her father in prison. The father's brother also brings Katelynn to the prison to visit. CT Page 11523
During an interactional evaluation between the father and both daughters conducted on January 21, 1998 by Dr. Julia Ramos Grenier, a psychologist who testified at trial, Katelynn was engaging and friendly with her father, but did not initiate affection. Dr. Ramos Grenier observed no indication of a parent-child relationship between the two.
Katelynn has bonded with Myrna R., the relative foster care provider. Myrna is committed to caring for Katelynn and would like to adopt Katelynn. DCF believes that it would be in Katelynn's best interest to be adopted by Myrna R.
B. Samantha
Samantha was born on April 27, 1996, and was almost two and a half years old at the time of trial. Samantha was born with a positive toxicology screen for cocaine, methadone and morphine. The mother reported that she had been using heroin daily prior to the birth and that her only prenatal care had been some seven months prior to the birth, during her incarceration in September, 1995. The father also admitted to heroin use. The parents had made no provisions in their home for the care of their new baby.
Samantha remained in the hospital for three weeks after birth while she went through withdrawal from drugs. Samantha was then placed directly in foster care. On May 21, 1996, DCF obtained an Order of Temporary Custody and, on September 24, 1996, the Court adjudicated Samantha to be neglected and committed her to DCF custody. Her current commitment expires on September 24, 1999. On August 21, 1997, the Court found that continuing efforts to reunify the child with her parents were no longer appropriate
Samantha was assessed by Birth to Three and receives that program's services. She interacts well with the other children in her foster home. She is an affectionate child who likes to interact with children and adults. She enjoys swimming and listening to stories.
Samantha has resided with Linda K., her foster mother, since her initial placement at three weeks of age. Samantha last saw her mother on October 28, 1996. The father visited Samantha three times prior to his July, 1996 incarceration. Since the father's incarceration, the father has seen Samantha only three or four more times. On November 25, 1997, during a visit that took place CT Page 11524 at the prison chapel, Samantha cried for the entire time, refused to get close to the father, and clung to her foster mother, whom she called "Mom." Because of Samantha's adverse reaction, DCF ended prison visits between Samantha and the father. As mentioned, an interactional evaluation conducted by Dr. Ramos Grenier did take place on January 21, 1998. This meeting was held at Juvenile Court. During the evaluation, Samantha was not attracted to her father, there were no signs of friendliness on her part, and there was no indication of a parent-child relationship. In general, the father does not send cards to Samantha, he has not inquired about her, and he has not requested pictures of her from DCF. Samantha looks to her foster mother as her main source of support. DCF approves of an adoption of Samantha by the foster mother.
C. The Father
At the time of trial, the father, Samuel R., was forty-four years of age. He was born in San Juan, Puerto Rico, and moved to Connecticut at the age of eighteen. The father has an eighth grade education. Judging by his use of an interpreter at trial, he does not speak English. He has worked a variety of jobs over the years with no discernible career or profession Although the father has never married, he has a twenty-one year old daughter from a previous relationship, in addition to Katelynn and Samantha.
Samuel R. has used illegal drugs on and off for over thirty years. He has three convictions for sale of narcotics and one each for violation of probation and tampering with a motor vehicle. At the time of the trial, he was incarcerated at Enfield Correctional Facility, serving a four and one-half year sentence imposed on July 11, 1996, for sale of narcotics and violation of probation. That sentence, if served without reduction, would not expire until January, 2001.
In the two months between the imposition of court-ordered expectations in April, 1996, and the commencement of his current incarceration, Samuel R. substantially failed to fulfill those expectations. Thus, he did not consistently keep his appointments with DCF, he did not keep his whereabouts known, he missed three out of six scheduled visits with Samantha, he did not attend the first meeting of a drug counseling program to which DCF referred him. he did not remain substance free, he did not have a steady income, and he did not refrain from becoming involved with the CT Page 11525 criminal justice system.[2]
The father has been incarcerated continuously since July, 1996, more than half of Katelynn's life, and virtually all of Samantha's life. During this time, the father has completed several drug programs in prison, but he did not follow through with educational counseling and there was no evidence that he has addressed his occupational shortcomings.
Dr. Ramos Grenier testified that Samuel R. is a dependent person who needs people around him. He did not give Dr. Ramos Grenier any indication that he was capable of raising children independently and, in fact, suggested that he would need a wife for such a task. The father did not inform Dr. Ramos Grenier that he had participated in drug abuse counseling in prison and, partly as a result, Dr. Ramos Grenier recommended that he obtain additional substance abuse treatment and individual psychotherapy.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. Sec. 17a-112(c)(1). The Court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. As stated above, the Court has already made such a finding for both children.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998). General Statutes sec. 17a-112(c)(3) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the Court waives the one year requirement based on the standards set forth in 17a-112(d).[3] In this adjudicatory CT Page 11526 phase, the Court is limited to events preceding the filing of the petition of the latest amendment. See Practice Book sec. 33-3(a). The relevant date in this case is September 11, 1997.
DCF in this case proceeded to trial on the grounds of failure to rehabilitate as to both children, and the additional ground of lack of an on-going parent-child relationship with regard to Samantha. DCF alleges that these grounds have existed for more than a year as they apply to each child. The Court finds that DCF has proven failure to rehabilitate but not lack of an on-going parent-child relationship.
1. Failure to Rehabilitate
A ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes sec. 17a-112(c)(3)(C). The statute requires the Court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'" In re Luis C., 210 Conn. 157, 167 (1989). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In re Jessica M., 49 Conn. App. 229,240 (1998) (internal citation omitted).
No dispute exists that the Court has previously found both children to have been neglected. The rest of the statute requires the Court to find whether the facts "encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes sec. 17a-112(C)(3)(C). Because of the requirement that the Court predict what will happen within a "reasonable time" after the filing of the termination petition, it is sensible to conclude that the Court can consider not only the parent's conduct before the filing of the termination petition, but also the conduct occurring after it.
The evidence at trial was clear and convincing to the Court that the father has failed to take the necessary steps to CT Page 11527 rehabilitate himself either before or after the filing of the petitions to terminate parental rights The father's lack of a high school education, the absence of a steady employment history, his extensive drug history, his serious criminal record, and his apparent inability and unwillingness to raise children independently are all factors that reveal that the father was and is in need of extensive rehabilitation. Notwithstanding this need, the father did not meet most of the court-ordered expectations prior to his incarceration but instead persisted in selling drugs and thereby violating his probation. After his incarceration, the father did complete several substance abuse courses in prison. These courses may be insufficient given the father's extensive drug history, the risk of relapse, and Dr. Ramos Grenier's recommendation for more drug therapy. The father has not addressed his other rehabilitative needs. Given these wide-ranging needs and the fact that the father may not be released from prison until the millennium, the Court concludes that the father cannot, within a reasonable time, considering the ages and needs of Katelynn and Samantha, assume a responsible position in their lives.
2. No On-Going Relationship
DCF also alleges that there is no on-going parent-child relationship between the father and Samantha. To prove this ground, DCF must show the absence of "the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes sec. 17a-112(c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In reJuvenile Appeal (Anonymous), 181 Conn. 638, 645 (1980) (internal citation omitted). While normally the question is whether the child has no present memories or feelings for the natural parent," id. at 646, in the case of a very young child removed from the hospital at birth, the Court should focus on whether the parent has positive feelings for the child. See In re Valerie D.,223 Conn. 492, 532 (1992).
In the present case, there is simply no evidence of whether, CT Page 11528 prior to the September 11, 1997, filing of the termination petition, Samantha had positive feelings for the father. Even if the Court focuses on whether, prior to September, 1997, the father had positive feelings for Samantha, which seems an appropriate inquiry given Samantha's early removal and her young age, there is similarly an absence of evidence. The November, 1997 and January, 1998 meetings between the father and Samantha demonstrated that Samantha does not have positive feelings for he father, but these meetings occurred after the filing of the termination petition. The Court concludes that DCF has failed to provide clear and convincing evidence of lack of an ongoing parent-child relationship that predates September, 1997.
3. One Year Requirement
The Court finds that the condition of failure to rehabilitate supporting the petitions as to Katelynn and Samantha has existed for more than one year prior to the filing of the petitions. Moreover, the Court can waive the one year requirement if it finds that "[f]rom the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child." General Statutes sec. 17a-112(d)(1). Based on the discussion that follows of the best interests of the child, the Court waives the one year requirement to the extent necessary to sustain this decision.
DISPOSITION
In the dispositional phase of a termination case, the Court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes sec. 17a-112(c)(2). The Court can consider all events occurring through the close of the dispositional hearing. Practice Book sec. 33-5. In arriving at a decision, the Court must consider and make written findings regarding seven factors set out in General Statutes sec. 17a-112(e). See In re TabithaP., 39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1. The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the Court finds that DCF, in a timely manner, provided foster care for the children, CT Page 11529 arranged for visitation, and offered drug counseling for the father.
2. Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the Court reaffirms the finding that DCF made reasonable efforts to reunite the family but that the father's criminal conduct and his sporadic record of visitation and contact with his children made reunification unrealistic.
3. The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
At the time of the commitment of Katelynn. the Court approved the following expectations: (1) keep all appointments set by or with DCF; (2) keep whereabouts known to DCF and your attorney; (3) visit the child as often as DCF permits; (4) attend and participate in counseling, including parent, individual and drug and alcohol counseling; (5) sign releases of information; (6) secure and maintain adequate housing and income; (7) no substance abuse and (8) no arrests/convictions with the criminal justice system. As detailed above, DCF substantially met its obligation to provide assistance. As stated, the father's compliance with these expectations prior to his incarceration was poor. After his incarceration, the father has made efforts to address his substance abuse problem but has not addressed his other long term needs.
4. The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, the children are bonded to their present foster families. They are not bonded to their father.
5. The age of the child.
Katelynn is currently four years old and has lived most of CT Page 11530 her life in foster care. Samantha is currently two and one-half has lived her entire life in foster care. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. See In re Juvenile Appeal(83-CD), 189 Conn. 276, 292 (1983). The Appellate Court has also observed that "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence in custody cases." In re Alexander V.,25 Conn. App. 741, 748 (1992). Thus it is not in the best interests of the children to keep them in temporary foster care settings for the purpose of giving the father more time to rehabilitate himself.
6. The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the Court finds that the father's lengthy prison sentence, his failure to rehabilitate himself, his inability and unwillingness to raise the children on his own, and, as established by the dispositional evidence, his lack of an on-going relationship with Samantha make it impossible to return the children now and inadvisable to do so in the future.
7. The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
Based on the evidence, the only significant impediment that the father faced that was not of his own making was the mother's substance abuse. Even here the father bears some responsibility, because he was selling drugs himself and he obviously knew that the mother was using drugs at the time that Katelynn and Samantha were conceived.
CONCLUSION
CT Page 11531
Based upon the foregoing findings, the Court determines that it is in the best interest of Katelynn and Samantha for a termination of parental rights to enter with respect to the mother. Kimberly, G. and the father, Samuel R. Accordingly, the Court hereby terminates their parental rights. The Court further orders that the Commissioner of DCF is appointed statutory parent for these children for the purpose of securing an adoptive family. If the foster parents are willing to adopt, it is the Court's direction that they receive first consideration. The Commissioner shall file with this Court no late than ninety days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
Carl J. Schuman Judge, Superior Court